UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA ) | | |
| ) | | |
| v. ) | Criminal No. 21-10190-ADB | |
| ) | | |
| FLORENCE MWENDE MUSAU, a/k/a ) | **LEAVE TO FILE PARTIALLY UNDER** | |
| Sarah James, a/k/a Precious Adams, ) | **SEAL GRANTED (Dkt. 145)** | |
| a/k/a Catherine Muthoki, ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For two-and-a-half years, defendant Florence Musau participated in a fraud conspiracy that targeted dozens of lonely, vulnerable victims and stole more than $900,000 from them. Her principal co-conspirator told her that the victims were "mugu"—slang for fools—and even sent her, as a cautionary warning, a news story about federal charges in this District against other defendants participating in the same type of scheme. To cover her tracks, Musau used fake passports and executed structured bank withdrawals, and she even used her fraudulent bank accounts to receive pandemic-assistance benefits in the names of victims whose identifying information had been stolen. The defendant's conduct has yielded a Guidelines Sentencing Range ("GSR") of 51 to 63 months of incarceration as calculated by the parties, or 70 to 87 months in prison as calculated by Probation without credit for acceptance of responsibility.

For the reasons set forth below, the government respectfully recommends that Musau be sentenced to a term of 44 months in prison, two years of supervised release, no fine considering her restitution obligations, a $100 mandatory special assessment, restitution as set forth in the pre-sentence report ("PSR") due and payable immediately, and forfeiture.

I.      **The Offense and Relevant Conduct**

    A.      **Background and Offense Conduct**

In late 2018, Musau entered the United States on a tourist visa. PSR ¶ 135. At the time, she was in her mid-thirties, had earned an advanced degree at Kenya Polytechnic University College in Nairobi, and had managed her own business. *Id.* at ¶¶ 159, 163.

Shortly after entering the United States, Musau began participating in a fraudulent online romance scam scheme that targeted and preyed upon lonely victims, generally women, across the country. *See generally id.* at ¶ 10. The nature of the scheme, the defendant's role in it, and how that role results in the calculation of the applicable GSR are not in dispute.

In short, as part of the scheme, co-conspirators abroad (*i.e.*, "victim-side co-conspirators") contacted vulnerable individuals via the internet and began online romantic relationships with the victims under false pretenses. *Id.* After the victim-side co-conspirators developed a relationship of trust with the victims, they asked the victims to send them money, via purported friends or family members in the United States, for a variety of false reasons. *Id.* Meanwhile, co-conspirators in the United States like Musau (*i.e.*, "money-side co-conspirators") opened fraudulent bank accounts using fake foreign passports and sent the account information and wiring instructions to their co-conspirators abroad. *Id.* When the victims, believing they were assisting their online romantic partners, sent money to the fraudulent bank accounts, Musau and other money-side co-conspirators like her quickly withdrew the fraud proceeds in numerous repeated structured ATM and teller transactions to evade detection. *Id.* Musau and her co-conspirators in the United States took a percentage cut for their role in the scheme, before sending the remaining fraud proceeds abroad to the victim-side co-conspirators. *Id.* When a victim reported fraud or a bank raised concerns, Musau and her co-conspirators abandoned the account, opening another account at a

different bank with the same fake identification, or if they felt the alias was compromised, obtaining a new fake passport and repeating the process. *Id.* Additionally, Musau received the proceeds of fraudulent pandemic unemployment claims submitted in victims' names to her bank accounts. *See id.* at ¶¶ 35–40.

To be sure, Musau did not devise the scheme or personally communicate with victims. And she is less culpable than her boyfriend and principal co-conspirator Mark Okuo, who encouraged her to join the scheme, taught her how to mislead banks and execute structured withdrawals, and provided her with her fake passports.[1] But Musau immediately understood the fraudulent nature of the scheme that she joined, and as an experienced, educated, well-traveled woman, she knew that what she was doing was wrong. For example, on December 7, 2018—shortly after she entered the United States—Musau instructed Okuo via text message to "hide any fake p [passports] in the house." Two weeks later, on December 20, 2018, she told Okuo via text message that she was taking "all the risk" by physically entering banks to open accounts and withdraw money. In June 2020, Okuo sent Musau a news story, via an encrypted messaging application, announcing charges by the U.S. Attorney's Office in Boston against "2 Nigerian nationals [who] used romance, [and] unemployment insurance scams to defraud victims during [the] pandemic," including a defendant who was sentenced by Judge Zobel to 63 months in prison, as discussed below.

The PSR sets forth the scope of the fraud, and Musau's role in it, in detail that the government will not recite it in full here. *See generally id.* at ¶¶ 9–102. However, below are a

---

[1] On January 27, 2023, Okuo is scheduled to plead guilty to the indictment charged in *United States v. Okuo*, 21-cr-10309-LTS.

3

few illustrative examples of how Musau participated in the scheme that targeted and defrauded vulnerable victims:

- ***Victim-1***.  Victim-1, a recently divorced single mother of three children, was deceived into sending the entirety of her six-figure divorce settlement to various participants in the scheme. *Id.* at ¶ 114.  In short, a victim-side co-conspirator posed as a member of the United States Army, targeted Victim-1 on the internet, and developed a fake online romantic relationship with her that lasted more than six months.  *See id.* at ¶¶ 15–20.  To trick Victim-1, the co-conspirator sent her doctored photographs of a man wearing a United States military uniform and a United States passport, and gave her a variety of stories why he desperately needed money, including to return to the United States to visit Victim-1.  *Id.*  In February 2019, Okuo texted Musau that he had a "mugu"—the Nigerian pidgin slang word for "fool"—referring to Victim-1 (who had already sent thousands of dollars to other co-conspirators in the scheme). *Id.* at ¶ 11.  After Okuo told Musau that he had found a "mugu" that they could capitalize on, Victim-1 sent more than $100,000 to accounts secretly controlled by Okuo and Musau, including $122,000 to accounts controlled by Musau. *Id.* at ¶ 20.  For example, in April 2019, Musau used a fake passport in the name of one of her aliases, "Catherine Muthoki," to open a bank account in the Boston area. *Id.* at ¶ 89.  The next month, on May 13, Victim-1 sent $20,000 to the account that Musau had opened. *Id.* at ¶ 91.  Just hours later, Musau began rapidly withdrawing the fraud proceeds from Victim-1 in structured amounts—$19,600 via ten different withdrawals.  *Id.*  Two weeks later, Victim-1

sent Musau $20,000 again, with Musau again quickly withdrawing $19,600 in seven separate transactions. *Id.* at ¶ 92.

- ***Victim-2***. Victim-2 is a woman who, like Victim-1, was deceived into believing she was in an online relationship with a member of the United States Army stationed in Africa, and she attempted to send him money so that he could return home to live with her. *Id.* at ¶¶ 21–24, 81–80. When Victim-2 realized that she was the victim of a scam (after sending $32,000 to various co-conspirators), she reported to law enforcement that she was "embarrassed and ashamed." Specifically, in May 2020, Musau used a fake passport in the name of one of her aliases, "Precious Adams," to open another bank account in the Boston area. *Id.* at ¶ 80. Later in May, the victim-side co-conspirator instructed Victim-2 to send $8,000 to the account Musau had opened, and she did. *Id.* at ¶¶ 82–83. The same day that she received $8,000 from Victim-2, Musau executed six different withdrawals around Boston (totaling $7,800), and about a week later, abandoned the account. *Id.* at ¶ 83.

- ***Victim-6***. Victim-6 is a Massachusetts woman who was employed full-time during the pandemic and did not submit a claim for pandemic unemployment assistance ("PUA"). *Id.* at ¶ 37. In May 2020, a co-conspirator abroad submitted a PUA claim to the Massachusetts Department of Unemployment Assistance ("DUA") using Victim-6's stolen personal information, including her date of birth and social security number, and requested the funds be deposited in a bank account opened by Musau in the name of her alias, Precious Adams. *Id.* at ¶ 35. On May 20, 2020, the DUA authorized and released approximately $10,820 in unemployment benefits

for Victim-6—funds intended to relieve the financial struggles suffered by employees during the pandemic—to Musau's account. *Id.* at ¶ 74. The same day, Musau was photographed using the fake passport in the name of Adams to withdraw $8,000 of the fraudulent pandemic relief proceeds from a bank branch in the Boston area. *Id.*

In total, Musau used three fake passports, opened at least seven fraudulent bank accounts, and more than $900,000 in fraud proceeds flowed through the bank accounts of Musau and Okuo.[2]

Further, when Musau was arrested and charged by complaint with conspiracy to commit bank fraud and wire fraud based on the conduct above, investigators seized more than 100 reloadable debit cards from the apartment and cars of Musau and Okuo in Canton. Further investigation revealed that Okuo, Musau, and other co-conspirators had recently begun to transition the scheme from (more detectable) fraudulent bank accounts to (less detectable, and less traceable) Green Dot cards, from which Musau and other co-conspirators withdrew $1,000 at a time from local retail stores. *Id.* at ¶¶ 101, 103. Approximately $485,000 of fraudulent pandemic assistance and other fraud proceeds had been transferred on to those cards. *Id.*

### B. Procedural History and Other Relevant Conduct

In March 2021, Okuo and Musau were arrested, charged via complaint, and detained pending trial. Dkt. 4. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In June 2021, the defendant signed a plea agreement and pleaded guilty to an information before this Court. *See* Dkts. 44, 46, 48, 49. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] This figure excludes several hundred thousand dollars in fraud proceeds solely attributable to accounts opened and controlled by Okuo before Musau joined the conspiracy.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Meanwhile, Okuo and Musau were communicating via tablets issued to Wyatt detainees through a third party. *See* PSR ¶ 102. Okuo directed Musau to not speak with investigators and told her that he would have someone "reach out" and "touch" the prosecutor to show him he "will be the victim[]." *Id.*

In February 2022, Musau filed a letter to the Court and a *pro se* motion to withdraw her guilty plea. *See* Dkts. 73, 74. In those *pro se* filings, she made several false and misleading statements to the Court, including that: she was arrested without an arrest or search warrant; ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ she did not understand English; and that she did not review the charging document before pleading guilty. *Id.*; *see also* Dkt. 89. In May 2022, the Court denied her motion as moot given the appointment of new counsel. Dkt. 105. After a series of status conferences, repeated requests for and appointment of new counsel, and the government's production of complete post-plea discovery, the defendant notified the Court and the government (through her fourth attorney in this case, and her third CJA counsel) that she would not be moving to withdraw her guilty plea, and instead, requested a prompt sentencing date. Dkts. 134–136.

## II. The Applicable Sentencing Guidelines

In accordance with the plea agreement (Dkt. 46), the parties agree that Musau's Total Offense Level (after a three-level reduction for acceptance of responsibility) is 24, which based on her criminal history, yields a GSR of: 51 to 63 months in prison; two to five years of supervised release; and a fine of $20,000 to $1,000,000. Dkt. 46; *see* PSR ¶¶ 4, 169.

Probation agrees with the parties' calculation (including all offense-specific enhancements), but has concluded that the defendant is not entitled to credit for acceptance of responsibility under USSG § 3E1.1, which results in a GSR of 70 to 87 months in prison. PSR ¶¶ 3, 102, 110, 122. While the government understands Probation's position—which is not without support in precedent—the government stands by its plea agreement and respectfully submits that a three-level reduction for acceptance of responsibility is warranted under the circumstances here for the reasons set forth in its second objection to the initial PSR.[3] If the Court agrees with Probation, Musau's Total Offense Level is 27, which results in a GSR of: 70 to 87 months in prison; two to five years of supervised release; and a fine of $25,000 to $1,000,000. PSR ¶¶ 168, 171, 177.

Under the circumstances, at this time, no departures from the applicable GSR are warranted. *See* PSR ¶ 183.

### III. Sentencing Recommendation

The government recommends the following sentence: 44 months in prison; 24 months of supervised release;[4] no fine based on the defendant's restitution obligations and ability to pay; a $100 mandatory special assessment; restitution as set forth in the PSR; and entry of the Court's

---

[3] The government notes, however, that the Court's determination may be informed by the defendant's statements leading up to, and during, her sentencing.

[4] According to ICE, deportations in 2021 and 2022, including deportations to Kenya, were at record lows. Accordingly, it is uncertain whether Musau, a non-violent offender, will be deported following the completion of her sentence. Thus, the government respectfully submits that USSG § 5D1.1(c) does not apply. When Musau's counsel was advocating for her pre-trial release on conditions, it became clear that she had no family or friends in the United States able to assist her, and there was a significant risk that she would be homeless. If Musau is not deported and remains in the United States following her conviction, it is in every party's interest—the public, the government, the Court, victims awaiting restitution, and even Musau herself—that she have the benefits, structure, and support of supervised release. *See generally* U.S. Immigration and Customs Enforcement, "ICE Annual Report," Dec. 30, 2022, *available at* https://www.ice.gov/doclib/eoy/iceAnnualReportFY2022.pdf.

preliminary order of forfeiture in the Court's final judgment (*see* Dkts. 137, 138). The government respectfully submits that its recommended sentence, including an approximate 15 percent downward variance from the floor of the GSR (as calculated by the parties), is sufficient but not greater than necessary under the circumstances, for the following reasons. *See* 18 U.S.C. § 3553(a).

### A. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

A sentence of 44 months is consistent with sentences imposed on other defendants in this District who were convicted of opening accounts to facilitate romance scams, business e-mail compromise schemes, and other online frauds. *See* 18 U.S.C. § 3553(a)(6).

In *United States v. Iyalekhue*, 20-cr-10208-RWZ, the defendant pleaded guilty to an information charging one count of conspiracy to commit mail and wire fraud and one count of money laundering in connection with his role in a similar romance scam. Indeed, the scam was so similar that Okuo sent Musau a news story to warn her about the federal charges against Iyalekhue. The nature and scope of the fraud was similar: Iyalekhue opened 10 fraudulent accounts, and the applicable loss amount was $813,000. Judge Zobel sentenced Iyalekhue (who had a criminal history resulting in a higher GSR than Musau) to 63 months in prison.

In *United States v. Balogun*, 19-cr-10230-DPW, the defendant pleaded guilty to an indictment charging him with one count of money laundering conspiracy arising from similar romance scam and business e-mail compromise schemes. Notably, Balogun was less culpable than Musau: he opened one fraudulent account, and the intended loss was approximately $550,000. Judge Woodlock sentenced Balogun to 42 months in prison.

In *United States v. Osemwegie*, 21-cr-10219-DJC, the defendant pleaded guilty to a one count information charging him with conspiracy to commit bank and wire fraud. As part of his

9

role in romance scams, Osemwegie used four aliases, and his conduct involved an intended loss of approximately $686,000. Judge Casper sentenced him to 32 months in prison. Osemwegie's history and characteristics, including his level of contrition and acceptance of responsibility, however, stand in contrast to Musau. Osemwegie was a naturalized United States citizen, had a 10-year track record of stable employment in the United States prior to his arrest, remained employed while on pre-trial release, had two young children in the United States, and told the Court, among other things, at sentencing: "I feel completely ashamed and embarrassed. I take full responsibility for my actions and und understand that these individuals [the victims] . . . deserve not to have been exploited. . . . I'm aware that my disgusting act has affected those around me. . . . I understand that for my actions, there are always consequences. I know that I deserve to be punished for my involvement and I also believe in the fairness of this court."

These sentences and the applicable GSR, in comparison to Musau's GSR, are set forth in the table below:

| Case | Docket No. | GSR | Sentence |
| --- | --- | --- | --- |
| United States v. Iyalekhue | 20-cr-10208-RWZ | 63–78 months | 63 months |
| United States v. Musau | 21-cr-10190-ADB | 51–63 months | [44 months gov. rec.] |
| United States v. Balogun | 19-cr-10230-DPW | 46–57 months | 42 months |
| United States v. Osemwegie | 21-cr-10219-DJC | 46–57 months | 32 months |

B. **The Need to Afford Adequate Deterrence to Criminal Conduct**

General deterrence is particularly important here. *See* 18 U.S.C. § 3553(a)(2)(B). In June 2020, Okuo literally sent Musau a news article about federal charges against Iyalekhue for participating in the same type of scheme, in the same geographic area, in the same time period. But rather than stop their fraudulent conduct, Okuo and Musau continued it, and they even became

more sophisticated by using less detectable and traceable reloadable debit cards to execute the scheme.

Unfortunately, online scams taking advantage of lonely and elderly victims are increasingly rampant[5] because they are relatively easy to complete, and the large amounts of money available attract those willing to risk a few years in prison.  Further, nearly all victim-side co-conspirators are located in countries where the risk of capture and extradition is low.  However, these schemes rely on participants in the United States, like Musau, to open fraudulent bank accounts and purchase reloadable debit cards that provide a venire of legitimacy to victims who would otherwise balk at sending money directly to countries like Nigeria.  If there is a meaningful chance to reduce the hundreds of millions of dollars in losses to romance scam victims annually, Musau's sentence should reflect the need to deter the many others who might be—and year after year, are—willing to engage in the same misconduct.  *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated then sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

The need for specific deterrence and to protect the public are factors here as well, 18 U.S.C. § 3553(a)(2)(C), particularly with a defendant who knew that the scheme was targeting "mugu," understood that what she was doing was wrong, was aware that others were being prosecuted for the same conduct, and nevertheless made the wrong choices over and over again.

---

[5] *See, e.g.*, Federal Trade Commission, "Romance scams take record dollars in 2020," Feb. 10, 2021, *available at* https://www.ftc.gov/news-events/blogs/data-spotlight/2021/02/romance-scams-take-record-dollars-2020 (reported losses reached $304 million, up 50% from 2019); Federal Trade Commission, "New FTC Data Show Consumers Reported Losing More Than $200 Million to Romance Scams in 2019," Feb. 12, 2020, *available at* https://www.ftc.gov/news-events/press-releases/2020/02/new-ftc-data-show-consumers-reported-losing-more-200-million (reported losses reached $201 million, up 40% from 2018).

### C. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Musau's crime was serious, caused significant harm to real people, and is not mitigated by her history and characteristics. *See* 18 U.S.C. § 3553(a)(1). She and her co-conspirators capitalized on dozens of lonely victims' desire to find companions, using promises of love to persuade them to wire large sums of money into accounts that Musau and her co-conspirators opened using counterfeit passports. Some of those victims depleted their savings, have experienced the after-effects on their credit and banking ability, and have been left too "ashamed and embarrassed" to even report the fraud to police, much less confront at sentencing those individuals who executed the scheme. The losses caused by Musau's fraud, the number and vulnerability of the victims, and the sophisticated manner in which the fraud was executed and covered up, are measures of the seriousness of Musau's offense and counsel in favor of a meaningful term of incarceration beyond the time she has spent in pre-trial detention.

Musau's history and characteristics do not excuse her conduct; if anything, they make it more reprehensible. Indeed, it should be Musau, not her victims, who feels "ashamed and embarrassed": a woman who "has a history of being in abusive relationships" with men (PSR ¶ 144) willfully joined a scheme that preyed upon lonely, vulnerable victims, principally women, and stole their money. Musau, the daughter of a mother who struggled to raise four children in a poor village after her father passed away, participated in a scheme that defrauded Victim-1, a single mother of three children, of more than $100,000. And to supplement the income from *that* fraud, Musau also facilitated the theft of government money that was reserved for employees suffering from unemployment during a global pandemic. Musau—who reports that she was raised in a "very poor" household in Kenya without electricity or running water (PSR ¶ 136)—knows what it is like to need money. But Musau did not need to steal money to buy food to feed herself or her family,

during the pandemic or otherwise. She was employed and had sufficient income, although apparently did not earn as much as she wanted to pay for things like the Lexus she drove around to various banks to open fraudulent accounts. *See* PSR ¶¶ 160–62, 165.

### D.  The Need for the Sentence Imposed to Promote Respect for the Law and to Provide Just Punishment

Here, Musau has shown about as much respect for the law as she did the scheme's victims. *See* 18 U.S.C. § 3553(a)(2)(A). She understood that the scheme targeted "mugu," she knew she had to cover her tracks with fake passports and structured withdrawals, she knew that others committing the exact offense had been charged with federal crimes, and she chose to thumb her nose at the law and the victims she had defrauded. She did not act out of coercion, duress, or desperation. Nor was her participation the result of a momentary lapse in judgment or weakness of will. Rather, she demonstrated a prolonged, two-and-a-half year willingness to engage in an exploitation of victims for the sake of personal profit. Her motive was purely personal gain, and that motive can—and should—be punished. And, even after being charged, her conduct has continued to exhibit a lack of respect for the law and this Court, blaming the numerous lawyers appointed (and retained) to represent her and making several false statements in letters and other filings.

## IV.  Conclusion

A sentence that does not include a meaningful term of incarceration in addition to time that Musau has already served will do more to undermine than promote the sentencing interests underlying Section 3553(a). The government's recommendation of a 15 percent downward variance from the bottom of Musau's applicable GSR as calculated by the parties is adequate to

account for Musau's lesser culpability than her main co-conspirator Okuo, and is a reasonable, fair, and just sentence.

For the foregoing reasons, the government respectfully recommends a sentence of 44 months in prison; 24 months of supervised release; no fine based on the defendant's restitution obligations and ability to pay; a $100 mandatory special assessment; restitution due and payable immediately as set forth in the PSR; and entry of the Court's preliminary order of forfeiture in the Court's final judgment

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     */s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be filed under seal (Dkt. 145), that a partially redacted version will be filed on the public docket, and that unredacted copies will be submitted to the Court, all counsel of record, and Probation.

By:     */s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney